UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

United States of America

                v.

Eric Hubbard,

                        Defendant.

**Report and Recommendation**
14-CR-179S

---

## I.    INTRODUCTION

On the evening of June 19, 2014, defendant Eric Hubbard ("Hubbard") and another man were walking down Genesee Street in the City of Buffalo. Hubbard, by his account, was in town from Detroit for a funeral. Hubbard was not doing anything to draw attention to himself, but Buffalo police officers who patrolled the area regularly did not recognize him as someone from the neighborhood. The officers stopped their patrol vehicle in the left westbound lane on Genesee Street and asked Hubbard for identification. The officers became suspicious at how Hubbard reacted: He did not produce identification; he stated non-responsively that he was from Detroit; he looked around nervously; and he angled or "bladed" his body away from the officers while appearing to tap or grab at his waistband. The officers repeated their request for identification but received the same response and saw the same behavior. The officers exited the vehicle; one approached Hubbard and frisked Hubbard's waistband, finding a loaded 9mm pistol. Hubbard now faces a charge of being a felon in possession of a firearm.

Judge Skretny referred this case to this Court on October 2, 2014. (Dkt. No. 12.) On October 15, 2015, as part of his omnibus pretrial motions, Hubbard filed a motion to suppress evidence obtained on June 19, 2014. (Dkt. No. 15.) In short, Hubbard argues that the police

officers had no reason to engage him at all on June 19, 2014 and had no reasonable suspicion to justify stopping him and frisking him. The Government points to officer safety and the totality of the circumstances on the evening in question as the basis for reasonable suspicion. The Court held a suppression hearing on March 30 and May 16, 2016. After considering the testimony from the hearing and all of the parties' papers, the Court respectfully recommends denying Hubbard's motion.

II.     BACKGROUND[1]
     A. *Events of June 19, 2014*

     This case involves differing views of a cascade of events that turned an unremarkable walk down the street into an arrest for unlawful firearm possession. All of the events in question happened on June 19, 2014 at about 8:00 PM, around 1011 Genesee Street, near Fillmore Avenue, in the City of Buffalo. (*See generally* Dkt. No. 34.) In that area, Genesee Street has a roughly east-west layout and has two traffic lanes running in each direction. Hubbard and an unidentified second man were walking eastbound on Genesee Street, on the south sidewalk adjacent to the eastbound lanes. (Dkt. No. 37 at 13, hereinafter denoted [13].) Hubbard and the other man appeared to be walking together, but Hubbard was a short distance behind the other man. [61, 62.] The two men were not obstructing traffic, yelling or screaming, running, or carrying anything; they were doing "[n]othing suspicious at that point." [42]; *see also* Dkt. No. 40 at 32, hereinafter denoted {32}.

---

[1] To the extent that the parties have highlighted any inconsistencies in witness testimony from the suppression hearing, this background section constitutes the Court's factual findings and assessments of witness credibility.

While Hubbard and the other man were walking, Buffalo police officers Michael Acquino ("Acquino") and Mark Hamilton ("Hamilton") were conducting a routine patrol of the Genesee-Fillmore area. Hamilton was driving a marked police vehicle, and Acquino sat in the passenger seat. [7.] Hamilton and Acquino had been patrolling the area daily because "[i]t's a high-crime area . . . High volumes of drugs, gangs, shootings, homicides." [10–11]; *see also* {34–35} ("Q. Why do you patrol this area so often? A. Well, it's high gang activity, drugs, guns. The street where this red brick—where this red brick roof, this whole street, any time of day you can go, there are cars lined up for marijuana."). When Hamilton and Acquino drove around on routine patrol, they would drive below the speed limit as long as doing so would not obstruct traffic. {12.} Hamilton and Acquino would drive "[w]ay less than 30 because just on routine patrol we drive under the speed limit as we observe the surroundings." {12}; *see also* [33] ("We were going slow. When we're on routine patrol, especially through that area, we're driving at a slow pace . . . . 15 miles an hour.").

Hamilton and Acquino's patrol brought them to where Hubbard and the other man were walking. Hamilton and Acquino were driving westbound on Genesee Street as they saw Hubbard and the other man walking eastbound. [13, 33.] Acquino noted quickly that Hubbard did not look familiar to him. "At that point I looked at the defendant and I did not recognize him. Like I said, I patrol the area every day, and I just did not recognize him." [13]; *see also* [43] ("I've never seen it [*i.e.*, Hubbard's face] before."). Hamilton did not recognize either of the men. {22.} Hamilton stopped the police vehicle in the left westbound lane and asked for identification; he may have directed his request to both men. {19–20, 22.} "[I]f I ask for ID usually a compliant

3

citizen will just give me ID or show me some identification and say, yes, I have ID. Whether I wanted him to do anything beyond that, we didn't get to that." {23}; *but see* [63–64] ("What I thought would happen was—this is hypothetical—that your client would have said okay I got ID, and we would have pulled up to him . . . . We would have drove up to him, to the sidewalk, and established that he gave me ID."). Acquino did not remember any response from Hubbard to Hamilton, prompting him to ask Hubbard for identification as well. [14.] Hubbard did not produce identification but instead stated that he was from Detroit. [15]; {24}. Hubbard, who by now had caught up to the other man and was standing with or near him [62–63]; {21}, appeared to say something to the other man. [15.][2] Hubbard then "bladed," turning his body to his right to prevent Hamilton and Acquino from seeing his waistband and front area. [16.] To Acquino, blading is "basically like police jargon, turning away from his front—any area he's turning away from us usually to discard or to get rid of something . . . . A lot of my field training officers used to use it." [16–17.] When Hubbard started blading, Acquino "kept focusing on his front area, and I noticed that he was grabbing at his front waistband area." [17.] The "tapping and grabbing at his front waistband" [19] drew Acquino's attention because, in his experience, "there could be possibly something in his front waistband." [19.] Hubbard also "kind of was pacing back and forth . . . . Looking to his front, turning around going back towards his back, quick steps." [17.] In addition to the blading, Acquino considered Hubbard's pacing suspicious. "In my opinion, watching it over the years, that he was either about to run or look for a place to run." [18.] Acquino also had

---

[2] Acquino allegedly found out, after arresting Hubbard, that Hubbard was telling the other man that he (Hubbard) was going to jail. [29.]

4

in mind that "[i]t's a violent crime area. I've never seen him before. At that point the nervous act he was acting in." [18.]

Around this point in the sequence of events, Hamilton changed the position of the police vehicle. The police vehicle had been stopped in the left westbound lane of Genesee Street. Hamilton now turned the vehicle 90 degrees counterclockwise to have it in the middle of the left eastbound and left westbound lanes, perpendicular to the south sidewalk and facing Hubbard and the other man. [20.] Just before that turn, Buffalo police officers Ronald Clark ("Clark") and John Simonian ("Simonian") happened upon the emerging scene while driving eastbound on Genesee Street. {40.} Clark and Simonian pulled over along the south sidewalk. [19]; {28, 40}. Clark and Simonian did not activate the turret lights on their police vehicle. {28.}

The events of June 19, 2014 quickly came to a head. Acquino asked Hubbard a second time for identification. [26.] Hubbard replied a second time that he was from Detroit. [26.] Clark "noticed that Mr. Hubbard immediately looked very nervous and he looked to his left, which was my direction, and he looked to his right again and, again, it appeared to me that he was seeking to run or flee from the scene." {45.} Acquino "stated to him that's not what I'm asking you. I just want some ID." [26.] Acquino then exited the police vehicle, approached Hubbard, and asked for identification a third time. [27]; {26}. Hubbard started walking toward Acquino; Hamilton then exited the vehicle. {26}; *but see* [26] (Hubbard "began walking toward the patrol car acting like he was going to his pockets, like he was going to get the ID."). Hubbard "turned his front area away from me again, and I could tell he continued to grab and tap at his front area." [27.] By that time, Acquino decided that the situation "was an officer safety issue. For the safety

5

of myself, Officer Hamilton, and the other officers on scene, I did a pat down of the area that he was grabbing . . . . Went for his front waistband area, started patting down for a weapon." [27.] Acquino felt an object that he thought was a handgun. [28.] Acquino thought that the object was a handgun from "the shape of it. I've dealt with a lot of firearms, and I could definitely tell the feel and the shape of a gun." [29.] Acquino lifted Hubbard's shirt and saw the back of a pistol. [28.] Acquino pulled the pistol from Hubbard's pants. [28.] At about that moment, Hubbard allegedly explained to Acquino "that he was going—going to be going to jail. He told me that it was his girl's gun, that it was registered. Later on in the conversation I asked him why he continued to tap that area. He told me that it was because he didn't want it to fall off his belt." [29.] Hamilton and Acquino arrested Hubbard and filed a local felony complaint charging him with criminal possession of a weapon in the second degree. (Dkt. No. 15-1.)

In all, the sequence of events described above went quickly. Less than a minute elapsed between the 90-degree turning of Hamilton and Acquino's police vehicle and the placement of Hubbard in handcuffs. {29.} Acquino's exiting of the vehicle and recovery of Hubbard's firearm took seconds. {46.} At no time through Hubbard's arrest did Hamilton and Acquino activate their vehicle's turret lights or draw weapons. [27]; {20}. What became of the man accompanying Hubbard is not clear from the record but does not appear to affect any of the issues in this case.

### B. *This Case and the Pending Motion*

This case began when the Government filed a one-count indictment on October 2, 2014. (Dkt. No. 1.) In the indictment, the Government accuses Hubbard of being a felon in possession of a firearm and of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The indictment also contains a forfeiture notice for the firearm and ammunition seized at Hubbard's

arrest. The Court arraigned Hubbard on August 20, 2015. (Dkt. No. 9.) On August 26, 2015, at a detention hearing, Hubbard reserved his rights but did not make an immediate challenge to his detention. (Dkt. No. 11.)

On October 15, 2015, Hubbard filed the pending motion to suppress as part of his omnibus pretrial motions. (Dkt. No. 15.)[3] Hubbard has argued from the beginning that reasonable suspicion did not support the events of June 19, 2014, meaning that all evidence obtained that evening should be suppressed. (*Id.* at 6.) In his post-hearing briefing, Hubbard argues more specifically that he was stopped or "seized" for Fourth Amendment purposes when Hamilton and Acquino began asking him for identification. (Dkt. No. 53 at 7.) Part of Hubbard's argument seems to rest on the inference that he would have had to stop walking to comply with the request for identification and thus was literally stopped at that point. {19.} Additionally, Hubbard argues that a Fourth Amendment stop occurred by the second request for identification because of the way in which Hamilton and Acquino escalated the encounter. According to Hubbard, when he gave an arguably non-responsive answer to the first request for identification, Hamilton and Acquino could have inferred that he either did not have identification or that he did not want to comply with the request. (*See* Dkt. No. 53 at 8.) In response, Hamilton and Acquino repeated the request and made a dramatic and unorthodox maneuver with their police vehicle, making clear to Hubbard that "no" was the wrong answer. (*See id.*; *see also* {27} ("Is that standard procedure when you want to stop an individual on the street to park your car across two lanes? A. It's not standard procedure.").) In that context, Hubbard argues that his decision to

---

[3] Hubbard's non-dispositive pretrial motions are addressed in a separate Decision and Order that accompanies this Report and Recommendation.

start walking toward Acquino constituted submission to Hamilton and Acquino's show of authority. "No reasonable person would feel free to leave with two police officers seated in a patrol vehicle aimed directly at him, parked horizontally across a main road and blocking multiple lanes of traffic, with a second patrol vehicle in close proximity cutting off a path of retreat and two additional police officers ready to pursue." (Dkt. No. 57 at 9.) Adding in his contention that reasonable suspicion had not been established at his proposed point of submission, Hubbard concludes that both the stop and the frisk were illegal and should be suppressed.

The Government urges rejection of the suppression motion in all respects. The Government argues that the initial requests for identification did not implicate the Fourth Amendment at all, since Hamilton and Acquino had not displayed any indicia of authority such as drawing weapons, approaching Hubbard, or flashing their vehicle's turret lights. (Dkt. No. 54 at 15.) By the time the Fourth Amendment started to come into play, according to the Government, Hubbard had bladed his body and tapped his waistband, giving Acquino reason to think that Hubbard had a firearm. (*Id.* at 17.) Other factors, such as the location of the encounter and Hubbard's non-responsive answers, contribute to the Government's argument that Hamilton and Acquino reasonably acted to maintain their safety.

III.  DISCUSSION

    A. *Burden of Proof*

"In a motion to suppress physical evidence, the burden of proof is initially on the defendant. Once the defendant has established some factual basis for the motion, the burden shifts to the government to show that the search was lawful." *United States v. Breckenridge*, 400 F. Supp. 2d 434, 437 (D. Conn. 2005) (citations omitted); *see also United States v. Carollo*, No. 09 CR.

1058 VM, 2011 WL 6935292, at *2 (S.D.N.Y. Dec. 30, 2011) (citations omitted). "The government has the ultimate burden of persuasion." *United States v. Magaddino*, 496 F.2d 455, 460 (2d Cir. 1974) (citation omitted). "The standard of proof on the party who carries the burden is preponderance of the evidence." *United States v. Allen*, 289 F. Supp. 2d 230, 242 (N.D.N.Y. 2003) (citation omitted); *accord United States v. Martinez*, 992 F. Supp. 2d 322, 332 (S.D.N.Y. 2014) ("On a motion to suppress, the government bears the burden of proving the propriety of law enforcement conduct by a preponderance of the evidence.") (citation omitted).

### B. *Reasonable Suspicion Generally*

Generally, "[t]he Fourth Amendment applies to seizures of the person, including brief investigatory stops . . . . An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981) (citations omitted). "[T]he totality of the circumstances–the whole picture–must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at 417–18 (citations omitted). The Supreme Court in *Cortez* explained further what particularized suspicion means:

> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions–inferences and deductions that might well elude an untrained person.
>
> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain

9

common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

*Id.* at 418.

The criteria from *Cortez* and similar case law about particularized suspicion never come into play, though, unless a Fourth Amendment "seizure" actually has occurred. The Supreme Court has summarized the test for police conduct that rises to the level of a seizure:

A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement. Thus, an unintended person may be the object of the detention, so long as the detention is willful and not merely the consequence of an unknowing act. A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned.

When the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence, there needs to be some test for telling when a seizure occurs in response to authority, and when it does not. The test was devised by Justice Stewart in *United States v. Mendenhall*, 446 U.S. 544 (1980), who wrote that a seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *id.*, at 554 (principal opinion). Later on, the Court adopted Justice Stewart's touchstone, but added that when a person has no desire to leave for reasons unrelated to the police presence, the coercive effect of the encounter can be measured better by asking whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.

*Brendlin v. California*, 551 U.S. 249, 254–55 (2007) (internal quotation and editorial marks and citations omitted). Below the threshold show of authority, police officers may converse with

people on the street just as any private citizen can. "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means. If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." *United States v. Drayton*, 536 U.S. 194, 201 (2002) (citation omitted); *accord United States v. Lopez*, 553 F. App'x 10, 12 (2d Cir. 2014) (summary order) ("Police officers may ask for an individual's consent to a search, provided they do not induce cooperation by coercive means. There is no indication in the record that [the officer] used coercive means.") (citing *Drayton*).

With these principles in mind, the Court will examine each of the major events in this case in turn.

### C. Initial Encounter with Hubbard

Any attempt at a frame-by-frame review of events in this case will require some arbitrary delineations, but the Court will define the first stage of events as those occurring from the beginning through the initial requests from Hamilton and Acquino for identification. During this stage, Hubbard and the other man were minding their own business walking down the street, doing nothing at all to draw law enforcement attention. Hamilton and Acquino nonetheless fixed their attention on Hubbard, for the sole reason that they did not recognize him. That reason would be deeply problematic if a show of authority and a Fourth Amendment stop had occurred at that point and on that basis alone. *Cf. Brown v. Texas*, 443 U.S. 47, 52 (1979) (reversing a conviction where "Officer Venegas acknowledged that the only reason he stopped appellant was to ascertain his identity"). However, no indicia of a stop appeared during this first stage. "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave,

would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554 (citations omitted). None of the examples from *Mendenhall* are present here. Hamilton and Acquino did not activate their vehicle's turret lights, exit the vehicle, draw weapons, or engage Hubbard physically. Each officer merely asked Hubbard for identification. "[P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984) (citation omitted). The Court concludes that nothing implicating the Fourth Amendment occurred during the first stage of events in this case.

### D. *Repeated Requests and Observation of Waistband*

During the next stage of events, Hubbard gave his first non-responsive answer about being from Detroit, started pacing and looking around nervously in some fashion, and, critically, began making gestures at his waistband. Hamilton and Acquino turned their vehicle 90 degrees, made additional requests for identification, and exited the police vehicle. Acquino then frisked Hubbard immediately after exiting the vehicle. A few points are worth noting here. Hubbard neither refused to provide identification nor stated that he lacked identification. "[I]f the person refuses to answer and the police take additional steps—such as those taken in *Brown*—to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure." *Delgado*, 466 U.S. at 216–17 (citations omitted). The key here,

12

though, is understanding what the "additional step" in *Brown* was—a frisk. "Up to this point [in *Brown*] there was no seizure." *Mendenhall*, 446 U.S. at 556. The Court sees no reason to treat Hubbard's situation differently than the situation in *Brown*. Hubbard was stopped, for Fourth Amendment purposes, when he was frisked. The turning of the police vehicle in the middle of Genesee Street was, by Hamilton's own admission, outside standard procedure. {27.} Nonetheless, that gesture and even the exiting from the vehicle were little different than a non-coercive direction to "come over here for a second." *United States v. Moreno*, 897 F.2d 26, 30 (2d Cir. 1990), *abrogated in part on other grounds by Horton v. California*, 496 U.S. 128 (1990); *see United States v. Montilla*, 928 F.2d 583, 589 (2d Cir. 1991) ("Finally, although it is true that the agents did not tell appellees that they were free to leave or to refuse to talk to the agents, the encounter as described by Johnson possessed none of the indicia of force or authority that typically earmark a Fourth Amendment seizure.") (internal quotation and editorial marks and citations omitted).

At the same time, Hubbard's tapping and grabbing at his waistband, combined with his nervous gestures, added a new factor that undermines his argument for suppression—officer safety. "[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion

13

or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry v. Ohio*, 392 U.S. 1, 27 (1968) (citations omitted); *accord Arizona v. Johnson*, 555 U.S. 323, 334 (2009) ("Officer Trevizo surely was not constitutionally required to give Johnson an opportunity to depart the scene after he exited the vehicle without first ensuring that, in so doing, she was not permitting a dangerous person to get behind her."). Before Hamilton and Acquino exited their vehicle, their observations of Hubbard's waistband and their experience with what that could mean gave them reason to believe that Hubbard had something in his waistband. By the time Hamilton and Acquino were approaching Hubbard to continue an encounter that was not yet a seizure, the continued tapping and grabbing at the waistband elevated the officers' suspicions to a particularized suspicion of a firearm. *See also* [27] ("At that point I thought it was an officer safety issue."). Hamilton and Acquino's personal experience with the surrounding neighborhood was a minor factor that added context to their particularized suspicion.[4] Hamilton and Acquino were permitted to confirm, through a limited frisk, that further interaction with Hubbard would not put them in danger. The Government's burden is thus satisfied.

The officer safety issue distinguishes this case from a case that the Court examined recently and that both sides have cited—*United States v. Jones*, No. 15-CR-133S, 2016 WL 4361131 (Aug. 16, 2016) (report and recommendation pending). *Jones* shares with this case an initial encounter with police officers that did not rise to the level of a seizure, but it did not feature any concerns about officer safety. *Cf. Illinois v. Wardlow*, 528 U.S. 119 (2000). The officer safety issue also makes

---

[4] In considering the officers' experience with the neighborhood only a minor factor, the Court is mindful that "contextual factors, such as high-crime, should not be given too much weight because they raise concerns of racial, ethnic, and socioeconomic profiling." *United States v. Young*, 707 F.3d 598, 603 (6th Cir. 2012) (citation omitted).

Hubbard's situation consistent with other cases involving the tapping or grabbing of a waistband. *United States v. Vashja*, 282 F. App'x 942 (2d Cir. 2008) (summary order) contained the additional issue of reasonable suspicion of criminal activity—an issue not present here—but it addressed a frisk that followed suspicious gestures with the waistband. *Id.* at 944 ("Officer Carney then frisked Vashja and found a loaded revolver in Vashja's left waistband, the same place that Officer Carney had seen Vashja clutching moments before."). *See also United States v. Padilla*, 548 F.3d 179, 189 (2d Cir. 2008); *United States v. Bowden*, 45 F. App'x 61, 64 (2d Cir. 2002) (summary order).

The only way in which Hubbard could prevail here is if the Court applied the following rule: When police officers talk to someone on the street at close range in a non-seizure or consensual interaction, and when they have no reason at all to suspect other criminal activity, they must disregard their safety and a separate reasonable suspicion that the person is armed and acting to hide that fact from them. Hubbard has not made enough of a showing that the Court should follow such a rule. *Cf. United States v. Thompson*, 280 F. App'x 38, 41 (2d Cir. 2008) (summary order) ("Here, there is evidence to suggest that the initial conversation between Clarke and the officer was consensual, and that the encounter did not ripen into a detention until the officer noticed the bulge in Clarke's waistband which was revealed to be a firearm. We find no clear error in the District Court's decision.").

## IV.   CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends denying Hubbard's motion to suppress (Dkt. No. 15).

15

V.      OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

　　　　　　　　　　　　　　　　　　　　__/s Hugh B. Scott_____
　　　　　　　　　　　　　　　　　　　　HONORABLE HUGH B. SCOTT
　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE

DATED: November 8, 2016